United States District Court
Southern District of Texas
**ENTERED**
August 20, 2024
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| JERRET LEE SCOTT, (TDCJ # 02351896), | § § § | |
| Plaintiff, | § § | |
| vs. | § | CIVIL ACTION NO. H-23-2868 |
| DR. HUGHES, *et al.*, | § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Jerret Lee Scott, (TDCJ #02351896), is a former inmate of the Texas Department of Criminal Justice–Correctional Institutions Division ("TDCJ"). Representing himself and proceeding without prepaying the filing fee, Scott asserts a claim under 42 U.S.C. § 1983, alleging that Dr. Maria Hughes, Nurse Martha J. Walker, and Senior Practice Manager Brooke Davis of TDCJ's Ellis Unit violated his constitutional rights by deliberately refusing to treat him for his cystic fibrosis and asthma. (Docket Entry No. 1). At the court's request, Scott filed a more definite statement of his claims. (Docket Entry No. 9). After screening Scott's claims under 28 U.S.C. § 1915(e)(2), the court ordered the defendants to respond to the complaint. (Docket Entry No. 10). The defendants responded with a motion for summary judgment, supported by numerous exhibits. (Docket Entry No. 17). Scott did not file a response, and his time to do so has now expired. Having reviewed the motion and its exhibits, the applicable law, and the record, the court grants the defendants' motion for summary judgment and dismisses this action. The reasons are explained below.

I.      Background

Scott alleges that he was diagnosed as an infant with cystic fibrosis. (Docket Entry No. 1, p. 3). He also alleges that he has asthma, which he contends is an "adverse condition that cystic fibrosis may cause." (Docket Entry No. 9, p. 4). Scott alleges that he was treated for his asthma and cystic fibrosis with eight different medications while he was in the Tarrant County Jail. (*Id.* at 2). He alleges that when he was transferred to the TDCJ, medical personnel refused to provide him with any of the medications that he had been receiving while in jail. (*Id.* at 7-8).

Scott was transferred to several TDCJ units before being assigned to the Ellis Unit in February 2022. (*Id.*). Scott alleges that when he arrived at the Ellis Unit, Dr. Hughes refused to accept his medical history, told him that there was nothing wrong with him, and refused to provide any treatment for his cystic fibrosis or proper treatment for his asthma. (Docket Entry No. 1, pp. 3, 8). Scott alleges that Nurse Walker and "Nurse Davis" also refused to believe that he had cystic fibrosis and refused to treat him for that illness. (*Id.* at 3, 8, 9). He alleges that he was provided with some treatment for his asthma, but it was not the treatment he had been receiving before and it did not work as well to keep his symptoms in check. (Docket Entry No. 9, pp. 6-7). Scott alleges that because he was not provided with either medical treatment for his cystic fibrosis or proper treatment for his asthma, he suffered pain, discomfort, and repeated episodes of labored breathing while in TDCJ custody. (Docket Entry No. 1, p. 3). He also alleges that the defendants' actions resulted in him suffering a "mild stroke" while in TDCJ care. (*Id.* at 8).

Scott contends that the actions of Dr. Hughes, Nurse Walker, and "Nurse Davis" reflect deliberate indifference and a willful and wanton disregard for his health and welfare. (*Id*. at 3, 11). He seeks money damages to compensate him for his pain and suffering, as well as punitive damages for the allegedly willful conduct. (*Id.* at 10).

The defendants answered with a motion for summary judgment. (Docket Entry No. 17). They attached the affidavit of Tyra Phillips, a Program Supervisor with the TDCJ Inmate Grievance Department, who authenticated Scott's grievance records for the period of July 1, 2021, through November 2, 2023. (Docket Entry Nos. 17-4, 17-5, 17-6, 17-7). The defendants also attached the affidavit of Glenda M. Adams, M.D., M.P.H., who authenticated and discussed the relevant portions of Scott's TDCJ medical records. (Docket Entry Nos. 17-2, 17-3). In addition, the defendants attached the affidavit of Senior Practice Manager Davis, who believes that she is the "Nurse Davis" to whom Scott refers, although she is not a nurse or other medical professional. (Docket Entry No. 17-8). The defendants seek summary judgment based on Scott's failure to exhaust his administrative remedies before filing this action. (Docket Entry No. 17, pp. 7-12). In the alternative, they seek summary judgment because Scott's medical records establish that they did not act with deliberate indifference toward his medical needs. (*Id.* at 12-16). They also raise the defense of qualified immunity. (*Id.* at 16-17). Scott has not filed a response to the motion, and his time to do so has now expired.

## II.   Legal Standards

### A.   Actions Under 42 U.S.C. § 1983

Scott sues the defendants under 42 U.S.C. § 1983. "Section 1983 does not create any substantive rights, but instead was designed to provide a remedy for violations of statutory and constitutional rights." *Lafleur v. Texas Dep't of Health*, 126 F.3d 758, 759 (5th Cir. 1997) (per curiam); *see also Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). To state a valid claim under § 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *See West v. Atkins,* 487 U.S. 42, 48 (1988); *Gomez v Galman*, 18 F.4th

769, 775 (5th Cir. 2021) (per curiam). When no competent evidence exists to sustain a finding that the defendant violated the plaintiff's constitutional rights, summary judgment is properly entered. *See, e.g., Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019).

### B. Motion for Summary Judgment

The defendants have moved for summary judgment. "Summary judgment is appropriate only if 'the movant shows that there is no genuine [dispute] as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton,* 572 U.S. 650, 656-57 (2014) (per curiam) (quoting FED. R. CIV. P. 56(a)). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine [dispute] of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.,* 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-25 (1986)). "A fact is material if its resolution could affect the outcome of the action." *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 134 (5th Cir. 2010)). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (per curiam) (cleaned up).

If the moving party satisfies its burden to show no genuine dispute of material fact, the burden shifts to the nonmoving party to show that the motion should not be granted. *See Edwards v. Continental Cas. Co.*, 841 F.3d 360, 363 (5th Cir. 2016). To meet this burden, "the nonmovant must 'identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim.'" *Id.* (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.,* 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v.*

4

*Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).  In addition, Federal Rule of Civil Procedure 56 does not require the district court to sift through the record in search of evidence to support the nonmoving party's position.  *See Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (per curiam).  Instead, the nonmoving party must identify specific evidence in the record and clearly explain how that evidence supports his or her claim.  *Id.*

When reviewing the evidence, the court must "resolve factual controversies in favor of the nonmoving party."  *Little*, 37 F.3d at 1075.  But an actual controversy exists only "when both parties have submitted evidence of contradictory facts."  *Id.*  "'If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate."  *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) (per curiam) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

    **C.**    **Pleadings from Self-Represented Litigants**

Scott is representing himself.  Courts construe pleadings filed by self-represented litigants under a less stringent standard of review.  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam).  Under this standard, "[a] document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'"  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  But even under this liberal standard, self-represented litigants must still "abide by the rules that govern the federal courts."  *E.E.O.C. v. Simbaki, Ltd.*, 767 F.3d 475, 484 (5th Cir. 2014).  They must also "properly plead sufficient facts that, when liberally construed, state a plausible claim to relief, serve defendants, obey discovery orders, present summary judgment evidence, file a notice of appeal, and brief arguments on appeal."  *Id.* (cleaned up).

### III. Analysis

#### A. The Failure to Exhaust Administrative Remedies

The defendants argue that Scott's claims against them should be dismissed because he failed to exhaust his administrative remedies before filing suit. (Docket Entry No. 17, pp. 7-12). The summary judgment evidence supports their argument.

The Prison Litigation Reform Act bars an inmate's § 1983 action concerning "prison conditions" until "such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Courts have broadly interpreted the phrase "prison conditions" to include allegations of deliberate indifference in providing medical care. *See Jones v. Bock,* 549 U.S. 199 (2007); *Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[W]e hold that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); *Valentine v. Collier*, 956 F.3d 797, 804 (5th Cir. 2020) (per curiam) (applying the exhaustion requirement in a deliberate indifference case). Exhaustion is mandatory, regardless of the forms of relief sought through administrative avenues. *See Porter,* 534 U.S. at 524. In addition, courts require "*proper* exhaustion of administrative remedies." *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006) (emphasis added). An inmate does not properly exhaust the grievance process "by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.*

Unlike some circuits, the Fifth Circuit takes "a strict approach" to the exhaustion requirement. *Johnson v. Ford*, 261 F. App'x 752, 755 (5th Cir. 2008) (per curiam). If an inmate does not properly exhaust the available administrative remedies, "a court may not excuse a failure to exhaust" regardless of the circumstances*. Ross v. Blake*, 578 U.S. 632, 639 (2016). Instead,

6

when an inmate has not properly exhausted his administrative remedies before filing suit, his claims must be dismissed. *See Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004).

Texas prisons have a two-step grievance process that applies to all inmate grievances. Inmates must first file a Step 1 grievance, which "must be filed within fifteen days of the complained-of incident, [and which] is handled within the prisoner's facility." *Id.* The facility has 45 days to respond to a medical-care grievance. *See* TDCJ Offender Orientation Handbook, pp. 73-75, available at www.tdcj.texas.gov/documents (visited Aug. 8, 2024). If the inmate is unhappy with the response to a Step 1 grievance, he may appeal that decision by filing a Step 2 grievance appeal within 15 days from the date the processed Step 1 grievance is returned to him. *Id.* The State has 40 days to respond to most Step 2 grievance appeals, and 45 days in which to respond to medical-care grievance appeals. *Id.* An inmate must pursue a grievance through both steps of the process before that process will be considered exhausted. *See Johnson,* 385 F.3d at 515; *see also Wright v. Hollingsworth,* 260 F.3d 357, 358 (5th Cir. 2001).

To properly exhaust a claim through the TDCJ grievance process, the inmate must provide enough information to allow TDCJ to identify the specific problem or incident. *See Johnson*, 385 F.3d at 517. Only one issue may be raised in a single grievance. *See* TDCJ Offender Orientation Handbook, at 74. Because an inmate does not exhaust administrative remedies without pursuing his claims through *both* steps of the grievance process, an inmate cannot raise a new issue for the first time in a Step 2 grievance appeal. *See Randle v. Woods*, 299 F. App'x 466, 467 (5th Cir. 2008) (per curiam).

Scott's complaint alleges that the defendants refused to provide him with any care for his cystic fibrosis and proper care for his asthma. He contends that he exhausted his administrative remedies by filing a Step 1 grievance on April 8, 2022, and a Step 2 grievance appeal on May 12,

7

2022. (Docket Entry No. 9, p. 22). He attached these grievances to his complaint as proof of exhaustion.

> Scott's Step 1 grievance alleges as follows:
>
> On April 8, 2022, in medical in the doctor's office, I requested to be in a 24-hour medical facility after experiencing really bad chest pains and couldn't breathe and had gotten no medical attention at 3:00 a.m. in the morning. I'm really concerned about my health and safety – I do not feel safe here on Ellis Unit due to non-24-hour medical services and my condition of cystic fibrosis/asthma.

(Docket Entry No. 17-6, pp. 56-57). Scott's Step 2 grievance appeal states that he spoke with "the doctors and nurses" at the Ellis Unit and told them that, because of his cystic fibrosis, he did not feel safe because that Unit does not have 24-hour medical staffing. (*Id.* at 54-55). But while Scott's Step 1 grievance refers to an April 8, 2022, incident, his Step 2 grievance appeal alleges that he did not receive care during "an asthma attack/heart attack in the month of March this year at 2:30 in the morning." (*Id.* at 54). The only grievances referring to an alleged lack of care for cystic fibrosis and asthma are two Step 1 grievances that Scott filed at the Estelle Unit. Those grievances specifically complain about the treatment provided by the Estelle Unit medical providers. (Docket Entry No. 17-5, pp. 15-16, 63-64). Scott did not file a Step 2 grievance appeal from either of those Step 1 grievances.

These records show that Scott did not properly exhaust his administrative remedies as to his claims against the Ellis Unit defendants. Neither Scott's Step 1 grievance nor his Step 2 grievance appeal identify any of the defendants. Neither the grievance nor the appeal assert a claim that the named defendants were deliberately indifferent to his serious medical needs. Instead, the gist of Scott's grievances is that he is dissatisfied with his housing assignment rather than his medical care. Even if the Step 1 grievance and Step 2 grievance appeal could be construed as directed to the named defendants' actions, Scott did not exhaust the grievance process as to his

claims because his Step 2 grievance appeal impermissibly raises a new claim rather than challenging the decision on the claim raised in his Step 1 grievance. Because Scott did not raise the same claim in both the Step 1 grievance and the Step 2 grievance appeal, he failed to pursue either claim through both steps of the TDCJ grievance process.

The summary judgment evidence shows that Scott did not exhaust his administrative remedies as to his claims against Dr. Hughes, Nurse Walker, and Ms. Davis before he filed this action. As a result, Scott is not entitled to proceed with this action. The defendants' motion for summary judgment based on a lack of exhaustion is granted, and Scott's claims against the defendants are dismissed without prejudice for failing to exhaust his administrative remedies.

      **B.**      **The Merits of Scott's Claims**

The defendants argue in the alternative that even if Scott exhausted his administrative remedies, they are entitled to summary judgment because the evidence does not show that they violated Scott's constitutional rights to adequate medical care and treatment. The summary-judgment evidence supports their argument.

The Eighth Amendment protects inmates from cruel and unusual punishment arising from prison officials' deliberate indifference toward an inmate's injury or pain. *See Estelle*, 429 U.S. at 105. To prevail on a deliberate indifference claim, the inmate must prove that the prison medical provider acted with "deliberate indifference" to a "serious medical need" in a manner that "constitutes the unnecessary and wanton infliction of pain[.]" *Id.* at 104 (cleaned up); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (emphasizing that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment") (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1988)). "To show an official was deliberately indifferent, a plaintiff must demonstrate that the official is aware that an inmate faces a substantial risk of serious harm and disregards that risk by

9

failing to take reasonable measures to abate it." *Davis v. Lumpkin*, 35 F.4th 958, 963 (5th Cir. 2022) (quoting *Farmer*, 511 U.S. at 847) (cleaned up). This requires proof that the defendant "had subjective knowledge of [the inmate's] exposure to harm," and "denied or delayed . . . medical treatment." *Petzold*, 946 F.3d at 249.

The deliberate indifference standard is "extremely high." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). "Deliberate indifference is more than mere negligence or even gross negligence." *Brown v. Callahan,* 623 F.3d 249, 255 (5th Cir. 2010). "Actions and decisions by officials that are merely inept, erroneous, ineffective or negligent" do not amount to deliberate indifference. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998). Claims of "[u]nsuccessful medical treatment, acts of negligence, . . . medical malpractice" or "a prisoner's disagreement with his medical treatment" do not state a constitutional violation, "absent exceptional circumstances." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (cleaned up). Instead, to obtain relief for a constitutional violation based on deliberate indifference to medical needs, the inmate must show that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* (cleaned up).

### 1. The Claims Against Dr. Hughes and Nurse Walker

Scott alleges that Dr. Hughes and Nurse Walker were deliberately indifferent to his serious medical needs because they refused to provide him with treatment for his cystic fibrosis and did not provide him with adequate treatment for his asthma.

#### a. The Alleged Denial of Care for Cystic Fibrosis

In his complaint, Scott alleges that he was diagnosed with cystic fibrosis as an infant, but Dr. Hughes and Nurse Walker ignored that diagnosis, told him there was "nothing wrong with

him," and refused to provide him with any treatment for this condition. (Docket Entry No. 9, pp. 2-3). In their motion for summary judgment, Dr. Hughes and Nurse Walker argue that the objective medical evidence shows that Scott does not have cystic fibrosis. They argue that the objective medical evidence presented to them did not show that Scott faced a serious risk of harm. They argue that their medical decisions based on that evidence did not rise to the level of deliberate indifference.

The summary judgment evidence shows that before arriving at the TDCJ, Scott had been held in the Tarrant County Jail for several months. Scott's medical records from the jail show that he had a "history of cystic fibrosis without treatment" for many years. (Docket Entry No. 17-3, p. 6). When Scott arrived at the TDCJ in July 2021, he had prescriptions for albuterol HFA for asthma, colace for constipation, and melatonin for sleep, but he was not receiving any treatment for his alleged cystic fibrosis. (*Id.*). The TDCJ continued his prescriptions for albuterol and colace. (*Id.* at 7-10).

Scott was transferred to the Ellis Unit in February 2022. (*Id.* at 20). During his initial medical assessment, Scott did not report any current complaints relating to his alleged cystic fibrosis. (*Id.* at 20-22). His medical records included blood test results from JPS Health Services showing that he has one mutated cystic fibrosis allele, but he does not have the disease.[1] (*Id.* at 17, 20-22). Instead, he is a carrier of the disease. (*Id.* at 17-18). The records also include October

---

[1]Cystic fibrosis is an inherited disease that is characterized by the buildup of thick, sticky mucus that can damage many of the body's organs. (Docket Entry No. 17-3, p. 15 (citing Cystic Fibrosis Disease, available at https://medlineplus.gov/genetics/condition/cystic-fibrosis/#inheritance)). It is inherited in an autosomal recessive pattern, meaning that both copies of the gene (*i.e.*, each allele) must be mutated for the person to have the disease. (*Id.*). If a person inherits only one copy of the mutated gene (*i.e.*, one mutated allele), the person is a carrier of the disease, but does not actually have the disease. (*Id.*). The existence of the single mutated allele is important for genetic counseling, but it does not affect the health of the carrier. (*Id.* at 16 (citing How is Cystic Fibrosis Inherited, UCSF Health, available at https://www.ucsfhealth.org/education)).

2021 x-rays of Scott's chest and lungs, which show none of the characteristic abnormalities of cystic fibrosis. (*Id.* at 112). Dr. Hughes and Nurse Walker were entitled to rely on these objective medical test results and Scott's own statements concerning his lack of symptoms and lack of treatment when making decisions about what medical care and treatment were necessary. And based on those results and Scott's self-report of no health concerns, neither Dr. Hughes nor Nurse Walker subjectively knew in February 2022 that Scott had a medical condition that posed a serious risk to his health and well-being.

Scott did not voice any concerns about cystic fibrosis until March 27, 2022, when he complained during an overnight telehealth appointment about "lung pain" and "chest pain." (*Id.* at 29). He stated at that time that the lung pain was due to his cystic fibrosis, but he also stated that his disease was "well controlled." (*Id.*). Despite his claim that the disease was "well controlled," Scott insisted that he needed to be transferred to a unit with 24-hour medical services so that he could receive proper care. (*Id.* at 30). The overnight nursing notes state that Scott's breathing was even and unlabored and that he was in no apparent distress. (*Id.*). When Nurse Walker saw Scott in the clinic the next day, she increased his asthma medications but indicated that a transfer to a 24-hour medical facility was not medically necessary. (*Id.*).

Shortly after that clinic visit, Scott was temporarily transferred to a different TDCJ unit due to a psychiatric issue. When he returned to the Ellis Unit, Scott told Dr. Hughes that he did not have his inhaler and that "I am sure I have cystic fibrosis and you guys are not treating me for it." (*Id.* at 70). The notes from that visit state that Scott was not in respiratory distress, had no wheezing or rattles, and had an oxygen saturation of 100% on room air. (*Id.*). When Dr. Hughes told Scott that he did not have cystic fibrosis, he became "belligerent," and security had to escort him out of the medical area. (*Id.*).

Scott's medical and psychological records show that he continued to push for a transfer to a different unit after this incident based on his alleged need for treatment of cystic fibrosis. (*Id.* at 72, 85-89). In June 2022, after Scott was seen by a different medical provider, the TDCJ transferred him to the Estelle Unit. (*Id.* at 102). Further testing there confirmed that Scott does not have cystic fibrosis and instead is only a carrier of the disease. (*Id.* at 108).

An inmate may establish liability for improper medical care only by offering competent evidence of four facts: (1) he "must first prove objective exposure to a substantial risk of serious harm—in other words, the prisoner must prove a serious medical need"; (2) he "must prove the officials' subjective knowledge of this substantial risk"; (3) he must prove that the officials, despite their actual knowledge of the substantial risk, denied or delayed his medical treatment; and (4) he must prove that the delay or denial of medical treatment resulted in substantial harm. *Petzold*, 946 F.3d at 249. Scott's claim fails on the first two elements. First, the objective medical evidence available to Dr. Hughes and Nurse Walker showed that Scott does not have cystic fibrosis and therefore has no serious medical need for treatment of that disease. Second, because of the objective medical evidence available to Dr. Hughes and Nurse Walker, neither had subjective knowledge of any risk, much less a substantial risk, to Scott based on a failure to treat him for a disease that he did not have.

In his complaint, Scott insists that he suffers from cystic fibrosis and that Dr. Hughes and Nurse Walker were deliberately indifferent to his need for treatment for that disease. But Scott's medical records clearly establish that he does not have cystic fibrosis. Scott's unsupported allegations that contradict the objective medical evidence are insufficient to create a genuine factual dispute material to determining whether he received constitutionally adequate medical care. *See Gobert*, 463 F.3d at 346 n.23 (a plaintiff's unsubstantiated assertions are not competent

13

summary judgment evidence sufficient to defeat a properly supported motion for summary judgment). He points to no competent evidence that would support his claim that Dr. Hughes and Nurse Walker were deliberately indifferent to a serious risk of harm that he actually faced. Because Scott has not carried his burden to show disputed facts material to determining whether Dr. Hughes and Nurse Walker were deliberately indifferent, Dr. Hughes and Nurse Walker are entitled to summary judgment in their favor on this claim. Scott's claims for deliberate indifference against Dr. Hughes and Nurse Walker based on his alleged cystic fibrosis are dismissed, with prejudice because amendment would be futile.

### b. The Allegedly Improper Asthma Treatment

Scott also alleges that Dr. Hughes and Nurse Walker were deliberately indifferent to his need for proper treatment for his asthma. He contends that they did not properly treat his asthma because they discontinued certain medications and replaced them with others. This is a classic case of an inmate simply disagreeing with the medical treatment he was provided. Such a disagreement does not show deliberate indifference.

Scott's medical records show that when he was transferred to the Ellis Unit, Dr. Hughes and Nurse Walker prescribed several different inhalers to treat his asthma. They also prescribed oral medications for that condition. (Docket Entry No. 17-3, p. 20). Scott was assigned to the chronic care unit so that his asthma could be properly monitored. (*Id.* at 21). The records show that Scott was provided with additional treatment for his asthma when he requested it. (*Id.* at 29, 33, 39, 66, 70, 99). Deliberate indifference is not established "when medical records indicate that the prisoner was afforded extensive medical care by prison officials." *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015) (quoting *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)). The fact that Dr. Hughes and Nurse Walker refused to provide the specific medications Scott wanted

does not establish a claim for deliberate indifference. *See Arenas v. Calhoun,* 922 F.3d 616, 620-21 (5th Cir. 2019) (an inmate's disagreement with his medical treatment does not constitute deliberate indifference) (citing *Gobert,* 463 F.3d at 346); *Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019) (same).

The competent summary judgment evidence shows that neither Dr. Hughes nor Nurse Walker denied Scott treatment for his asthma. His disagreement with the treatment he received does not support a claim for deliberate indifference. Scott has not submitted or identified disputed facts material to determining whether the treatment Dr. Hughes and Nurse Walker provided was constitutionally inadequate. The undisputed facts in the record defeat any claim that the treatment was unconstitutional. The motion for summary judgment filed by Dr. Hughes and Nurse Walker concerning Scott's asthma treatment is granted. His claims against them for deliberate indifference in treating Scott's asthma are dismissed, with prejudice because amendment would be futile.

### 2. The Claim Against Senior Practice Manager Davis

Scott also sues Senior Practice Manager Davis, whom he identifies as "Nurse Davis." Scott alleges that "Nurse Davis" also denied him medical care and treatment for his cystic fibrosis and asthma. In response, Davis submitted an affidavit stating that she is not a nurse, she has no medical training of any kind, and her job as a senior practice manager is to handle the administrative aspects of running the Ellis Unit medical clinic. Her duties included ordering supplies and making sure that scheduling inmate appointments at the medical clinic complied with TDCJ policies. (Docket Entry No. 17-8). If Davis is asked to assist in responding to an inmate grievance, she simply gathers information from the medical providers, but she has no role in deciding on, or providing, medical care. (*Id.*).

Scott's claim against Davis is based on his mistaken belief that she was a medical provider. The undisputed summary judgment evidence shows that she was not. Scott has not presented or pointed to evidence showing factual disputes material to determining whether Davis was authorized to provide medical care and failed to do so. She was not. Scott's claim against Davis must be dismissed on this basis.

In addition, even construed liberally, Scott's claims against Davis fail because he does not allege facts showing that she had any personal involvement in his medical care or that she violated his constitutional rights. While the summary judgment evidence shows that Davis responded to one of Scott's grievances, the evidence does not show that Davis, a senior practice manager, had any authority to make decisions or take action about Scott's medical care. It is undisputed that Scott was under the care of Dr. Hughes and Nurse Walker. As a general rule, when an inmate is under the care of the prison's medical providers, other prison officials are justified in relying on those providers. *See Williams v. Certain Individual Emps. of Tex. Dep't of Crim. Just.,* 480 F. App'x 251, 257 (5th Cir. 2010) (per curiam) (non-medical prison personnel were not liable for deliberate indifference when prison medical personnel were aware of the inmate's medical complaints and the non-medical personnel had no authority to provide medical care). While Scott's Step 1 grievance may have alerted Davis to Scott's unhappiness with his medical treatment, Scott points to no evidence showing that Davis had any authority to order additional or different treatment. Scott points to no evidence that Davis either denied him care or delayed his access to care. *See Erickson*, 551 U.S. at 90 (non-medical prison officials may be guilty of deliberate indifference if they either delay or deny an inmate's access to care).

The record does not show factual disputes material to determining whether Senior Practice Manager Davis was deliberately indifferent to Scott's serious medical needs. She was not. Davis's

motion for summary judgment is granted, and Scott's claims against her are dismissed, with prejudice because amendment would be futile.

### C.      Qualified Immunity

Alternatively, the defendants assert that Scott's claims against them should be dismissed because they are entitled to qualified immunity. The doctrine of qualified immunity affords prison officials protection from individual liability for damages as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  When a defendant invokes qualified immunity, the burden shifts to the plaintiff to show that the defense does not apply. *See McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (per curiam).  To satisfy this burden, the plaintiff must show that the defendant violated the plaintiff's constitutional rights under clearly established law and that the defendant's actions were objectively unreasonable in light of that clearly established law. *See Wilson v. Layne*, 526 U.S. 603, 609 (1999).  If the plaintiff fails to prove either element, the defendant is entitled to immunity.  *See Pearson*, 555 U.S. at 236-37.

As discussed above, the competent summary judgment evidence reveals that the defendants did not violate Scott's rights under the Eighth Amendment. Because the undisputed evidence does not show a constitutional violation, the defendants are protected by qualified immunity. Their motion for summary judgment on this basis is granted, and Scott's claims against them are dismissed with prejudice, because amendment would be futile.

## IV.  Conclusion and Order

The defendants' motion for summary judgment, (Docket Entry No. 17), is granted and this action is dismissed with prejudice.  All pending motions are denied as moot.  Final judgment is separately entered.

SIGNED on August 20, 2024, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge